**Jorge W. RAMOS PENA, et al., Plaintiffs,**

v.

**NEW PUERTO RICO MARINE MANAGEMENT, INC. d/b/a NPR, Inc., Defendant.**

**No. Civ 98–1379 JP.**

United States District Court, D. Puerto Rico.

Nov. 24, 1999.

---

Jose R. Franco–Rivera, San Juan, PR, for plaintiff.

Pedro J. Manzano–Yates, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

Plaintiffs Jorge Ramos–Peña, Angel Bauzó–Calderón, Ramón Rey–Cruz, Gladys Ríos–Oquendo, and Edith Reyes–Figueroa filed the Complaint in the instant case alleging that its former employer, Defendant New Puerto Rico Marine Management, Inc., a corporation doing business as NPR, Inc. laid them off work because of their age and ethnicity. Plaintiffs also allege that Defendant has violated the Worker Adjustment and Retraining Notification Act ("WARN Act") by laying them off without sufficient advance notice. Plaintiffs Ríos and Reyes allege that they were laid off because they are women Plaintiffs Ramos and Bauzó, as United States veterans, have also sued under the Vietnam Era Veterans Readjustment Assistance Act ("VEVRA"). Defendant NPR, Inc. moves the Court to enter summary judgment against Plaintiffs in the instant action (**docket No. 17**).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment serves to "assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, a summary judgment is in order when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case the plaintiff,] reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Insurance Co. v. Benner*, 980 F.2d 23, 25 (1st Cir.1992). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a summary judgment motion, the movants, in this case Defendants, bear the initial burden of "informing the district court of the basis for their motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant does not bear the burden of proof at trial, it must show that no reasonable fact-finder could find that the non-movant, in this case Plaintiff, has established the requisite elements of its claim. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets his burden of proof, the burden shifts to the non-movant, who may not "rest upon mere allegations or denials of ... the pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." *Goldman*, 985 F.2d at 1116; *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. UNCONTESTED FACTS

1. Defendant New Puerto Rico Marine Management, Inc. is a corporation which does business as NPR, Inc. ("NPR").

2. In 1974, Navieras Authority ("Navieras") purchased the assets of Sea Land Service, Inc. in Puerto Rico.

3. Navieras contracted with Puerto Rico Maritime Management, Inc. ("PRIMMI") for the administration of its assets and business.

4. In March, 1995, NPR bought the assets of Navieras from the Government of Puerto Rico.

5. Upon acquiring the assets of Navieras, NPR realized that the processes of the company were very labor intensive, controlled, and procedure-conscious. Therefore, there was an immediate and continuing focus on eliminating redundant and unnecessary steps and positions. As part of this policy of eliminating inefficiency, NPR determined that better prices could be obtained by negotiating prices on a corporate-wide volume basis from corporate headquarters in Edison, New Jersey.

6. During their tenure, Plaintiffs Angel Bauzó–Calderón ("Bauzó") and Edith Reyes–Figueroa ("Reyes") heard that PRIMMI was experiencing large debt and considerable losses.

7. After acquiring its assets, NPR closed Navieras' operations in the ports of New Orleans, Baltimore, and Charleston.

8. In mid-March 1996, NPR laid off 51 of their 216 employees in Puerto Rico. Fifty-one of those employees worked at NPR's San Juan Port terminal. The other laid off employee worked at NPR's Ponce location. The next layoff in Puerto Rico took place on June 14, 1996, when two employees were laid off at the San Juan Port. During the 90 days that followed June 14, four additional employees were laid off in San Juan.

9. Before the lay off of March 1996, 39 employees (approximately 18%) of the NPR workforce in Puerto Rico were younger than 40 years of age and 177 (approximately 82%) were older than 40 years of age.

10. Before March 1996, NPR employed five non-Hispanics and 211 Hispanics in San Juan.

11. Co–Plaintiff Jorge Ramos Peña ("Ramos") was born on February 22, 1996 and was 50 years of age at the time of his layoff.

12. In 1979, Ramos began working for PRIMMI as an Automotive Purchases Manager.

13. In 1986, Ramos was promoted to Director of Purchases, where he supervised the Automotive and Maritime Purchases Managers.

14. In 1990, when the headquarters of the Purchasing Department were transferred to New Jersey, Ramos was given the position of Automotive Purchases Manager.

15. As Automotive Purchases Manager, Ramos supervised 12 employees and was responsible for the administration of the Purchases Department; the supervision of one buyer, one buyer's assistant, and one secretary; decision-making with respect to auctions; and sale of surplus equipment.

Further, Ramos had the authority to discipline, suspend, terminate, and approve vacation and sick leave for the employees he supervised. Plaintiff was an "exempt" employee, meaning that he was paid a salary and was not paid overtime.

16. On March 8, 1996, Ramos received a letter dated March 4, 1996 from NPR informing him that he had been laid off.

17. Some of the responsibilities that Ramos had as Purchasing Manager were absorbed by the Manager of Administrative Maintenance.

18. Ramos has not filed a complaint before the Veteran's Employment Service of the U.S. Department of Labor or before the Office of Federal Contract Compliance Program.

19. Ramos did not complete any application for another position at NPR.

20. Plaintiff Bauzó was born on February 28, 1949 and was 46 years of age at the time of his layoff.

21. Bauzó was hired by PRIMMI on April 14, 1980 and held the following positions: Jr. Accountant (1980–1982), Vessel Services Supervisor (1982–1990), Cost and Budget Administrator (1990–1992), Cost Budget Manager (1992–1995).

22. After NPR acquired the assets of Navieras, Bauzó was offered and accepted the position of Manager of Foreign Services, in charge of the Caribbean. At the time, Bauzó was at least 45 years of age.

23. As Manager of Foreign Services, Bauzó coordinated the handling of freight to their Caribbean ports and supervised its distribution to their corresponding ships. Bauzó also reviewed bills of lading, handled client satisfaction services, coordinated and scheduled ship arrivals, prepared Caribbean budget operations, and

handled the agent's supply needs for the Caribbean.

24. From January to July 1996, the Department of Operations Caribbean was reduced from a 12 to a six-person department.

25. On July 19, 1996, Bauzó who had belonged to this department, received notice of his layoff from Chuck Massey, the department's Director of Administration.

26. Although he alleges that he should have been offered the position of Sales Manager, Sales Representative, Director of Administration, Car Division Manager, or Vessel Operations Manager, Bauzó never applied for any of the first four positions. With regards to the Vessel Operation Manager position, Bauzó asked Iris Hernández of the Human Resources Office if he could apply to said position, to which she responded that he did not possess the necessary qualifications. According to the job description, the Vessel Operation Manager position required a bachelors degree in Science Degree of a Maritime Academy as well as a U.S. Coast Guard Officer License. Bauzó did not meet these requirements.

27. Bauzó has not filed a complaint before the Veteran's Employment Services of the Department of Labor or before the Office of Federal Contract Compliance Program.

28. Ramón Rey–Cruz ("Rey") was born on April 14, 1942 and was 53 years of age at the time of his layoff.

29. Rey was employed by PRIMMI from October 15, 1975 until March, 1985 when he was laid off. On June 13, 1994 and at the age of 51, Rey was re-employed by PRIMMI as the Collection Department Manager for Puerto Rico and the Caribbean.

30. As Collection Department Manager for Puerto Rico and the Caribbean, Rey was in charge of four supervisors, who in turn supervised 21 other employees.

31. From January to July 1996, the Credit and Collection Department went from a 26–person staff to a four-person staff.

32. The supervision of the employees of the Credit and Collection Department for San Juan was centralized under the position of Manager Caribbean Collections and Corporate Litigation, a position belonging to the Treasury Department in the corporate offices in Edison, New Jersey.

33. Before March 1996, the supervision of collection activities in the ports of Louisiana, Florida, and North Carolina had been centralized in Edison. After March 1996, the supervision of collections activities in the San Juan port was also centralized in Edison.

34. Rey was laid off in March 1996. He did not apply for any position in the Sales Department because there were no vacancies.

35. Gladys Ríos Oquendo ("Ríos") was born on July 24, 1941 and has a bachelors degree in secretarial sciences. At the time of her layoff, she was 54 years of age.

36. Ríos worked as a secretary for Sea–Land Services from 1960 to 1974. Thereafter, Ríos worked for PRIMMI from 1974 to 1995. While at PRIMMI, Ríos worked as Secretary from 1974 to 1975, Tariff Publishing Supervisor from 1975 to 1980, Assistant Pricing Manager from 1980 to 1981, Pricing Manager Puerto Rico from 1982–1992, and Pricing Manager Caribbean from 1992 to 1995.

37. From March 1995 to March 1996, Ríos worked as NPR's only Price Manager Caribbean, a position which belonged the Tariff Publishing/Pricing Department in San Juan. The duties and responsibilities of Ríos as Pricing Manager Caribbean were the following: establishing, negotiating,

and creating freight fees for the Caribbean; auditing bills sent by agents in the Caribbean; supervising tariff publishing; providing freight fees estimates for clients; supervising and training of personnel; and supervising one Tariff Publishing Manager, one secretary and two clerks.

38. NPR entered into a contract with DXI, Inc. ("DXI"), a corporation specializing in tariff publishing, for the latter to provide services to the former related to tariff publishing.

39. The Tariff Publishing/Pricing Department was abolished after NPR entered the services contract with DXI.

40. Ríos did not apply for any other position in NPR and did not request any promotion during her tenure with NPR. She was 52 at the time of her layoff.

41. Edith Reyes–Figueroa ("Reyes") was born on July 19, 1947.

42. On December 23, 1974, Reyes began working at PRIMMI as a Tariff Typist.

43. After NPR's acquisition of Navieras, Reyes, who was 49 at the time, received a promotion to Tariff Publishing Manager.

44. Reyes' supervisor was Co–Plaintiff Ríos, the Pricing Manager for the Caribbean.

45. As a Tariff Publishing Manager, Reyes was responsible for tariff publishing, coordinating prices with the Sales Department, and publishing proposals.

46. Reyes had no previous experience as a salesperson or general manager.

47. In 1996, there was only one Tariff Publishing Manager in Puerto Rico.

48. Reyes was laid off on March 15, 1996. At that time and upon being asked by Reyes, Tom Pirie, who informed Reyes of her layoff, told her that there were no positions available in her department.

49. After her layoff, Reyes did not apply to any position in NPR.

50. The minimum requirements to qualify for a position as Sales Manager at NPR were a bachelors degree in business, marketing, or management, five years sales background experience in the service industry, and three years experience managing personnel. The minimum requirements to qualify for a position as a Sales Representative at NPR were a bachelors degree in business administration; marketing or management, three years business experience; and a minimum of one year service industry sales experience. The Director of Administration requires a bachelor degree in business administration, accounting, or finance; further experience in human resources; and eight to ten years in related management experience with five or more years in the transportation industry.

51. Out of the 51 employees who were laid off in March 1996, 39 were older than 40. They constituted 76% of the laid off employees. Consequently, 12, or 24%, of the laid off employees were younger than 40.

52. After the entire reorganization, NPR's workforce was reduced from 216 to 139; the workforce of employees who were younger than forty years of age was reduced to 27. Therefore, after the layoffs and reorganization, 27% of the 139 employees were younger than 40. The number of employees who were over 40 after the layoffs and reorganization was 112, or 81% of the 139 employees. Therefore, 76% of the laid off employees were older than 40, but 81% of the employees after the reorganization were over 40.

## III. DISCUSSION

### A. TITLE VII

Plaintiffs' filed the instant case alleging that NPR retained and recruited non-His-

panic employees to occupy the positions of Sales Manager, Sales Representative, and Administration Manager. In addition, Co–Plaintiff Bauzó also alleges that NPR retained and recruited non-Hispanic employees to occupy positions that he believes should have been offered to him. Defendant argues that Plaintiffs' Title VII claim should be dismissed because it is uncontested that none of the Plaintiffs were qualified for the positions for which they aspired or which they said should have been given to them. The Court agrees.

There is no direct evidence on the record suggesting discrimination. Therefore, the familiar "the burden shifting framework," commonly known as the *McDonnell Douglas* structure, guides this analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff must set forth a prima facie case, which shifts the burden of production, not the burden of persuasion, to the defendant to state a legitimate and nondiscriminatory justification for the employment decision. *See Hazel v. United States Postmaster General,* 7 F.3d 1, 3 (1st Cir.1993). If and when the defendant meets its burden, the presumption of discrimination established by the prima facie case disappears from the case and the plaintiff must prove that the justification is merely a pretext for discrimination. *See Smith v. F.W. Morse & Co.,* 76 F.3d 413, 421 (1st Cir.1996).

In cases of failure or refusal to hire, a plaintiff's prima facie case is composed of four elements, to wit: (1) that the plaintiff is a member of a protected class, (2) that he or she applied and was qualified for the position in question, (3) that despite his or her qualification he or she was rejected, and (4) that after the rejection, the position remained open and the employer continued to seek applicants. *See Woods v. Friction Materials,* 30 F.3d 255 (1st Cir.1994). NPR correctly states that it is uncontested that none of the Plaintiffs were qualified for the positions they sought or allege they should have been offered, namely Sales Manager, Sales Representative, and Administration Manager.

It is uncontested that the position of Sales Manager required a bachelors degree in business, marketing, or management; five years sales experience in the service industry; and three years experience in managing personnel. It is uncontested that none of the Plaintiffs met the five years sales background experience in the service industry to fulfill the minimum requirement for the Sales Manager position. Similar to the Sales Manager position, the Sales Representative position required sales experience background and none of the Plaintiffs met that requirement.

It is also uncontested that the Administrator Manager in San Juan required a bachelors degree in business administration, accounting, or finance; further experience in human resources; and eight to ten years in related management experience with five or more years in the transportation industry. None of the Plaintiffs had eight years ·in related management experience in human resources. Furthermore, there is no evidence on the record for the proposition that the persons who occupied the Sales Manager, Sales Representative, or Administrator Manager positions did not meet the requirements of the job description.

As part of his Title VII claim, Plaintiff Bauzó alleges that NPR should have recruited him for the position of Car Division Manager or Vessel Operation Manager, and that he was denied the positions because he was a Hispanic born in Puerto Rico. As with the positions described before, NPR argues that Bauzó's claim should be dismissed because it is uncontested that he is not qualified for these positions. The Court agrees. It is also uncontested that the position of Vessel Operations Manager requires a degree from a Maritime Academy and an Officer license from the United States Coast Guard. Bauzó lacks both. Thus, Bauzó was not qualified for the position of Vessel Opera-

tions Manager and cannot claim discrimination where he never applied for the job either.

■ Besides alleging discrimination for failure to hire, Plaintiffs allege that NPR's reduction in force was also driven by ethnic-based animus. In order to successfully shoulder his or her burden, Plaintiffs must demonstrate that the employer either did not treat members of the protected class neutrally or retained persons not within the protected class in the same position. *See Udo v. Tomes,* 54 F.3d 9 (1st Cir.1995). In determining whether the employer failed to treat members of the protected class neutrally, the Court must compare the treatment of the members of the protected class with similarly situated employees who are not members of the protected class. *See Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993).

■ Defendant argues that Plaintiffs' claim for discriminatory layoff should be dismissed because no evidence on the record suggests a lack of neutrality towards Plaintiffs as compared to similarly situated employees. The Court agrees.

Plaintiffs allege that Armando Castro was recruited for the position of Sales Manager. It is uncontested, however, that Castro is a Hispanic born in Puerto Rico. Thus, Plaintiffs' allegation of ethnic-based discrimination is not compelling if the person with whom they are comparing themselves is of their same ethnicity.

Moreover, it is uncontested that the positions which Plaintiffs allege should have been offered to them are not comparable to the ones they held. Therefore, Plaintiffs have not made out a prima facie case.

■ Plaintiffs Ríos and Reyes claim that they were laid off because they are women. At the time of the reduction in force, Ríos worked as Manager of Tariff Publishing in San Juan. NPR, however, states that it is uncontested that the Tariff Publishing/Pricing Department was abolished after the reorganization of March 1996 and that DXI was contracted to han-

dle tariff publishing. Further, NPR states that it is uncontested that the functions by the Tariff Publishing/Pricing Department were assigned to NPR offices in Tampa and Edison. The Court agrees. In addition to these facts, there is no evidence on the record which contradicts Defendant's position. In view of this conclusion, Plaintiffs cannot sustain that similarly-situated male or non-Hispanic employees were retained to perform the functions they performed.

## B. Age Discrimination in Employment Act (ADEA)

Plaintiffs also allege that they were laid off because of their age in violation of the Age Discrimination in Employment Act. Defendant moves for summary judgment arguing that the uncontested evidence demonstrates that age did not play a role in Plaintiffs' layoff. The Court agrees.

■ In an ADEA case, a plaintiff shoulders the burden of proving that age was a determining factor in being subjected to an adverse employment action. *See Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1335 (1st Cir.1988). Moreover, when the plaintiff lacks direct proof of discrimination, the *McDonnell Douglas* framework guides the evidentiary burden. To establish a prima face case, the plaintiff must establish that he or she belonged to the ADEA's protected age group, being more than 40 years of age; that he or she met the employer's legitimate expectations; that he or she experience an adverse employment action; and that the employer "did not treat age neutrally or retained younger persons in the same position." *Cahue v. Iberia Lineas Aereas de Espana,* 82 F.3d 533 (1st Cir.1996). In the instant case, there is no evidence on the record that Defendant treated employees above the age of 40 less favorably than those who were similarly situated and who did not belong to the protected group or were younger.

■ Defendant has provided uncontested and complete statistical evidence which provides a clear framework of the age demographics at NPR before and after the layoffs. In March 1996, out of 216 employees at NPR, 177(82%) were older than 40 years of age and 39(18%) were younger than 40. By mid-March 1996, there were 51 layoffs, reducing the NPR workforce to 165. Out of those 51 employees, 39 were older than 40 while, 12 were younger than 40. Rather than looking at this evidence as supporting the proposition that there was age based discrimination because most people laid off were above the age of 40, it must be noted that the large majority of the workforce at NPR at the time of the layoffs was older than 40. Instead, the Court notes that it is uncontested that a larger proportion of the employees who were laid off were younger than 40. In particular, 31% of all the employees younger than 40 were laid off, while 22% percent of the employees who belonged to the protected age group were laid off. After the reorganization of 1996, the island-wide workforce was reduced from 216 to 139. Out of those 139, 27 were younger than 40 and 112 were older than 40. These figures reflect that after the layoff, the employment composition was largely over 40. There is no other evidence on the record that contradicts Defendant's position and no evidence that there was any age-based discrimination. Therefore, the Court hereby **DISMISSES** Plaintiff's claim under the ADEA.

## C. WARN Act Claim

Defendant further requests the dismissal of Plaintiffs' claim under the Worker Adjustment and Retraining Notification Act (the "WARN Act") which protects employees from unannounced mass layoffs. *See* 29 U.S.C. § 2101(a)(1)(B). Defendant sustains that it is uncontested that the amount of layoffs in a given site did not surpass the threshold of layoffs required to trigger WARN Act liability.

Determining whether Plaintiffs have a cause of action under the WARN Act requires defining the scope of several key terms. In order to have a cause of action under the WARN Act, the plaintiff must have experienced an employment loss. The Department of Labor defines "employment loss" as "(i) an employment termination, other than a discharge for cause, voluntary departure, or retirement; (ii) a layoff exceeding 6 months; or (iii) a reduction in hours of work individual employees of more than 50% during each month of any 6–month period." 20 C.F.R. part 639.3(f)(1). Therefore, by laying them off, Plaintiffs suffered an employment loss.

Furthermore, the loss of employment must constitute a mass layoff at a single site of employment. A "mass layoff" is a "reduction in force which ... is not the result of plant closing; and ... results in an employment loss at the *single site of employment* during any 30–day period for ... at least 33 percent of the employees; *and* at least 50 employees; or at least 500 employees." 29 U.S.C. § 2101(3) (emphasis added).

■ In view of this definition, the scope of "single site of employment" is critical to the Court's analysis. Defendant cites the Sixth Circuit decision in *Teamsters Local Union 413 v. Driver's*, 101 F.3d 1107 (6th Cir.1996), in support of the proposition that the number of employees laid off in San Juan, which is a single site, did not pass the threshold of a mass layoff. The *Teamsters*, the Court stated that "although no bright line test exists, the plain language of the statute and regulations make clear that geographic proximity provides the touchstone in determining what constitutes a 'single site.'" *Teamsters*, 101 F.3d at 1109. Contiguous facilities or those in close geographic proximity may be aggregated to compose one site. Noncontiguous sites may be considered a single site of employment when there is some connection between the sites besides common ownership. *See Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277 (8th Cir.

1996); *see also, Viator v. Delchamps,* 109 F.3d 1124 (5th Cir.1997) (weighing reasonably geographic proximity, purpose of the locales, and whether they share the same staff and equipment.)

In the instant case, the San Juan port is a single site of employment and other NPR sites in Puerto Rico, particularly Ponce where one of the March layoffs took place, should not be aggregated to form a single site. First, the Court takes notice that Ponce and San Juan are not in close proximity to one another. Second, there is no evidence on the record for the proposition that Ponce and San Juan shared the same staff and equipment. It is also uncontested that out of 213 employees, 50 were laid off from the San Juan Port. This is less than the 33% threshold set by the WARN Act. It is also uncontested that there were no layoffs in San Juan during the 30 day window leading up to or following the layoff in mid-March. The next set of layoffs in San Juan occurred in July 19, 1996. In view of these uncontested facts, Defendants' had not duty to give Plaintiffs advance notice of their layoffs under the WARN Act and the Court hereby **DISMISSES** said claim.

### D. VEVRA Claim

The Court is hereby **DISMISSING** Plaintiffs Ramos and Bauzó's claims under the Vietnam Era Veterans Readjustment Assistance Act ("VEVRA"). The First Circuit in *Barron v. Nightingale Roofing, Inc.,* 842 F.2d 20 (1st Cir.1988), established that VEVRA does not create a private cause of action. The enforcement of this statute is performed by the Department of Labor.

### E. Puerto Rico Claims

In view that the Court is dismissing Plaintiffs' federal claims, it also hereby **DISMISSES** Plaintiff's supplemental claim under Puerto Rico law.

## V. CONCLUSION

Pursuant to the above discussion, the Court hereby **GRANTS** Defendant's Motion dismissing Plaintiffs' Complaint.

**IT IS SO ORDERED.**